# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

|  |  |  |
|---|---|---|
| THOMAS EZEKIEL FORD, IV, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **16-11976-FDS** |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

This is an appeal of the final decision of the Commissioner of the Social Security Administration ("SSA") denying an application for social security disability insurance ("SSDI") and supplemental security income ("SSI") benefits. Plaintiff Thomas Ezekiel Ford, IV, alleges disability based on post-traumatic stress disorder, depression, anxiety, and obesity. The Administrative Law Judge determined that Ford retained a sufficient residual functional capacity to perform work existing in the national economy, and thus was not disabled under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d).

Ford has moved for judgment on the pleadings seeking an order reversing the ALJ's decision. He contends that the ALJ (1) failed to give proper weight to certain medical opinion evidence; (2) made an improper credibility determination that is not supported by substantial evidence; and (3) failed to properly account for his moderate mental limitations when presenting a hypothetical question concerning residual functional capacity ("RFC") to the vocational expert.

Defendant has cross-moved for an order affirming the ALJ's decision.

For the reasons set forth below, plaintiff's motion for judgment on the pleadings will be denied, and defendant's motion to affirm the ALJ's decision will be granted.

# I.   Background

## A.   Educational and Occupational History

Thomas Ezekiel Ford, IV, was born on February 23, 1974, and was 37 years old at the alleged onset of his disability.  (A.R. 46; *see* A.R. 49).  He received a bachelor's degree in sociology and comparative international development from Johns Hopkins University and a master's degree in political science from American University in Cairo, Egypt.  (A.R. 47-48).

From November 2009 to March 2011, Ford worked for the United States Agency for International Development as a General Development Officer.  (A.R. 250, 271, 458).  While he was embedded with the U.S. military in Afghanistan, Ford endured several life-threatening events, including witnessing enemy explosives cause the death of one soldier and another soldier's loss of three limbs.  (A.R. 458).  Ford then requested a transfer to a different base in Afghanistan because of job-related stress.  (*Id.*).

Upon his return to the United States in April 2011, Ford worked as a curriculum development and pre-deployment trainer for International Development Systems ("IDS"), a defense contractor based in Alexandria, Virginia.  (A.R. 271-73).  Ford left that job in June 2011, and then worked as a consulting expert until December 2012.  (A.R. 65, 271).  He has not worked since.  (*Id.*).

## B.   Medical Evidence

### 1.   November 2012-November 2013

Ford contends that he suffers from PTSD, depression, anxiety, and obesity.  On

November 19, 2012, Ford saw Mark Gorman, Ph.D., for an initial mental-health consultation at the Weight Center at Massachusetts General Hospital ("MGH").  (A.R. 367).  According to the doctor's report, Ford's mental status examination ("MSE") was normal except for diminished concentration, some guilt, and reports of sleep problems.  (A.R. 371).  Ford reported that his stressors were his "work/travel schedule" and "caretaking for parents."  (A.R. 368).  He reported that his current job at IDS required relocation every two to four weeks, so he had avoided making close, personal connections with his co-workers.  (A.R. 370).

Dr. Gorman assessed a Global Assessment of Functioning ("GAF") score of 71-80 and diagnosed a major depressive disorder in remission and emotionally-triggered eating in remission.  (A.R. 372).[1]  He also found that Ford demonstrated active symptoms of post-traumatic stress disorder, such as avoidance and numbing; insomnia, diminished concentration; and hypervigilance.  (A.R. 370).  However, Dr. Gorman opined that Ford did not meet the full diagnostic criteria of PTSD, because he was no longer experiencing flashbacks or intrusive memories.  (A.R. 372).  Dr. Gorman supported a referral for psychotherapy if Ford was interested.  (*Id.*).

Ford saw Elizabeth Goetter, Ph.D., at MGH for a psychiatric intake on December 19, 2012.  (A.R. 348).  Ford described the multiple traumatic experiences he faced as a civilian aid worker in Afghanistan.  (*Id.*).  Ford's chief complaint was "sleep issues."  (*Id.*).  Dr. Goetter noted that Ford experienced emotional and physical reactivity to trauma cues, such as anxiety, tachycardia, and flushing.  (*Id.*).  He reported increased irritability, hypervigilance, and diminished interest in socializing.  (*Id.*).  He stated that his mood had been "fine . . . more stable,

---

[1] A GAF score evaluates an individual's overall level of functioning.  A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors."  AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (DSM-IV) 34 (4th ed. Text Revision 2000).

less angry," but reported depressive episodes in the past, most recently in March through August 2012, that included decreased energy, loss of focus, and passive suicidal ideation. (A.R. 348-49). His MSE was within normal limits, apart from a blunted emotional affect. (A.R. 351-52). Dr. Goetter diagnosed major depressive disorder, recurrent and in remission, generalized anxiety disorder, and PTSD, assessing a GAF of 55. (A.R. 352).[2] She opined that his psychiatric symptoms were likely exacerbated by numerous psychosocial stressors, including job dissatisfaction, limited social support, his parents' failing health, and his own medical concerns. (A.R. 353).

Ford returned to MGH and saw Heather Kapson, Ph.D. on October 2, 2013. (A.R. 343). Dr. Kapson noted that Ford's primary complaint was that his role as his "parents' primary caregiver over the last 2 years" had been triggering, and living with them had prevented him "from working and from engaging in life with [his] spouse," who lived in Baltimore. (*Id.*). Ford again recounted the difficulties of his time in Afghanistan, and noted that his "tour ended by him visiting his parents and not returning when he saw their health significantly declining." (*Id.*). Dr. Kapson noted that Ford still met the symptoms for PTSD, but his symptoms, as reported by him, had decreased as compared with his first one-and-a-half years after his return from Afghanistan. (*Id.*). His PTSD Checklist score, or PCL score, had improved significantly from his intake in December 2012. (*Id.*; A.R. 352).[3] Dr. Kapson assessed a GAF score of 55. (A.R. 345). She also diagnosed major depressive disorder, recurrent and mild; generalized anxiety

---

[2] A GAF score of 51-60 indicates "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or social workers)." DSM-IV at 34.

[3] A PCL score measures the severity of a patient's PTSD; a lower score indicates a lesser severity. Ford's PCL score was 49 at his initial evaluation with Dr. Goetter on December 19, 2012. (A.R. 352). At his October 2, 2013, evaluation with Dr. Kapson, his PCL score was 35. (A.R. 343). According to estimates of the United States Department of Veterans Affairs National Center for PTSD, the veteran cutoff for PTSD is a PCL greater than or equal to 35, and the civilian cutoff is a PCL greater than or equal to 45. (A.R. 346).

disorder; and adjustment disorder.  (*Id.*).  She also noted economic, occupational, and social

support problems.  (*Id.*).

On October 30, 2013, Ford met with Ann R. Stewart, MSW, LICSW, to follow up on his

psychosocial needs.  He informed her that his mother had passed away on October 11, 2013.

(A.R. 391).  On November 12, 2013, Ford again saw Dr. Kapson and notified her of his recent

decision to move to Baltimore to be with his husband.  (A.R. 385).  Dr. Kapson noted that he

"appeared visibly relieved," and expressed "looking forward to being in one place where he can

establish roots, refocus on his career, and build a life with his husband."  (*Id.*).  Ford reported

that he generally felt more stable, but continued to struggle with sleep disturbances, fatigue,

motivation, and difficulty with change overall.  (*Id.*).  Ford's MSE was normal, his PCL score

further improved to 31, and his GAF score was 60.  (A.R. 385-86).

### 2.  State Agency Consultant Disability Determination – Dr. Walcutt

On November 13, 2013, Ford underwent a consultative psychiatric evaluation with Olga

Rossello, M.D., for his SSDI application.  (A.R. 397).  Ford recounted his experiences in

Afghanistan and reported sleeping problems, an "up and down" mood, irritability, and

concentration problems.  (*Id.*).  He reported that he stopped working because it exacerbated his

problems and caused him to be on edge and lose his patience.  (A.R. 398).  Dr. Rossello noted

that his MSE was normal and that he presented a cooperative attitude, a reactive affect, good

remote memory, and fair insight and judgment.  (*Id.*).  Ford reported that his typical day includes

"watch[ing] news, science, history stuff," and that he could cook, clean, and shop independently.

(A.R. at 398).  He stated that his hobbies were "cars [and] working out" and that he enjoyed

reading books about fishing and, for example, works by William Faulkner.  (*Id.*).  He explained

that when he goes to the market or mall, "he is comfortable with crowds if he gets in and out,"

and socially he "get[s] along with others . . . okay." (*Id.*). Dr. Rosello assessed a GAF score of 50[4] and diagnosed PTSD. (A.R. at 399). She noted that his capability appeared fair and that his condition could be improved by treatment. (*Id.*).

On November 25, 2013, Dr. Diana Walcutt, Ph.D., a state agency psychological consultant, completed a Disability Determination Explanation form after reviewing Ford's medical records and Dr. Rosello's evaluation. (A.R. 84-85, 88). Dr. Walcutt summarized and cited to Ford's treatment notes, and noted that Ford "suffers from extreme PTSD symptoms, violent mood swings [and] insomnia." (A.R. 86-88). She diagnosed severe anxiety disorder and severe affective disorders that resulted in mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and one or two repeated episodes of decompensation of extended duration. (A.R. 87-88). She further determined that despite Ford's insomnia and moderate difficulty with sustained concentration, he was able to understand and follow simple and complex instructions, and he could read, shop, and prepare meals. (A.R. 91). Dr. Walcutt found that Ford experienced mild to moderate limitations in areas dealing with continuity of performance and social interactions. (A.R. 92). Ultimately, Dr. Walcutt determined that because Ford had "the ability to interact and relate with others socially," could "adequately negotiate in the general community," and retained "the capacity to perform simple tasks from a mental health perspective," he was not disabled. (A.R. 93).

### 3. **April 2014-November 2014**

After relocating to Maryland, Ford began treatment on April 9, 2014, with Julie Eastin,

---

[4] A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 34.

Ph.D.  (A.R. 420-25).  Ford reported feeling "helpless," "trapped," withdrawn from people, and unable to be proactive.  (A.R. 420).  He said he felt some anger and had scared himself after punching a wall during an argument in January 2014.  (*Id.*).  He denied any thoughts of suicide, but expressed that he "accomplished the goals [he] wanted to, and now there[']s no reason left to stay here."  (A.R. 423-24).  He reported a stressful past few months because of his partner's "neediness" and feeling as though "he is a psychologist more than a husband."  (A.R. 421).  He noted that he used to enjoy music, reading, and writing, and that his recent efforts to write again had been difficult because of his lack of concentration.  (A.R. 422).  Dr. Easton noted that his MSE was normal.  (A.R. 423).  She assessed a PCL score of 70 and diagnosed PTSD.  (A.R. 424).

Ford first saw Heather Chase, LCSW, on May 14, 2014.  (A.R. 413).  She noted that his MSE presented a neutral affect and low mood, but was otherwise normal.  (A.R. 413).  Ford reported difficulty concentrating, intrusive thoughts, guilt, insomnia, grief and loss, and relational challenges.  (*Id.*).  He described thoughts of "not being here anymore," but denied any suicidal ideations.  (*Id.*).  Ford next met with Chase on May 29, 2014, and appeared "slightly dysphoric" and "tired," and became "tearful" in response to Chase's discussion about coping skills.  (A.R. 412).  At his next session on June 5, 2014, Ford presented with a neutral affect at first, but overall displayed a dysphoric mood and affect.  (A.R. 415).  Chase performed no MSE.  (*Id.*).  Ford stated that he recently experienced panic when expressing his needs to his husband and described the grounding coping technique he used in response to that panic.  (*Id.*).  At his fourth session with Chase on June 12, 2014, she noted no significant changes to Ford's presentation.  (A.R. 417).  She discussed more distress-tolerance skills with Ford.  (*Id.*).  There are no treatment notes in the record from Chase after the June 12 appointment, but a behavioral

health summary indicates Ford saw her 19 more times through November 25, 2014.  (A.R. 478).

### 4.    State Agency Consultant Disability Determination, Dr. Nunez

On June 24, 2014, Jeannie Nunez, Psy.D., a state agency psychological consultant, reconsidered Ford's disability determination by reviewing Dr. Walcutt's DDE and Ford's updated medical records.  (A.R. 126-38).  Dr. Nunez reaffirmed Dr. Walcutt's conclusion.  (A.R. 137-38).

### 5.    August 2014-January 2015 and Medical Opinions

On August 8, 2014, Ford saw Dr. Douglas Gartrell, M.D., and reported panic symptoms, poor sleep, feeling unsafe when someone is behind him, some depression, anhedonia, and poor appetite, energy, concentration, memory, and motivation.  (A.R. 505).  He reported flashbacks and being triggered by sound because of his work trauma.  (*Id.*).  Dr. Gartrell noted that his MSE reflected good hygiene; a cooperative attitude; clear speech; good eye contact; normal behavior; a constricted, sad, and anxious affect; a dysphoric and anxious mood; an organized thought process with thought content within normal limits; good insight and judgment; and no suicidal risk.  (A.R. 507-08).  Dr. Gartrell diagnosed depressive disorder and PTSD, assessed a GAF score of 60, and prescribed mirtazapine and Xanax.  (A.R. 508-09).  At an August 29, 2014 follow-up, Ford reported depression ("7/10"), sleeping a lot, anxiety, and isolation.  (A.R. 495).  Ford's MSE remained mostly unchanged, except for the addition of an irritable mood.  (*Id.*).

On September 17, 2014, Chase wrote a letter to Ford's representative discussing her work with him since May 2014.  (A.R. 432).  She opined that Ford's current symptoms of anxiety and depression were "significant barriers to his ability to work," and thus qualified him as disabled.  (*Id.*).  She stated that Ford was working to gradually increase his exposure to crowds and social settings, but found it "unlikely that [Ford] would be able to tolerate the continued social

interaction that comes with a full-time job" and that his challenges with focus and concentration would render him unable to perform work reliably. (*Id.*). To support her opinion that Ford's "challenges with sleep and fatigue" would make it "difficult for [him] to attend a job on time and reliably," Chase cited the fact that he had missed weekly therapy "on a number of occasions" due to his sleep problems. (*Id.*). Chase wrote a similar letter on November 20, 2014. (A.R. 472).

Chase also completed a mental assessment form on September 17, 2014, and indicated that Ford had extreme limitations in his ability to relate to co-workers, deal with the public, deal with work stressors, and maintain attention/concentration and marked limitations in his ability to use judgment and understand, remember, and carry out complex job instructions. (A.R. 433-34). She noted that Ford had mild to moderate limitations in other work capabilities, for example functioning independently and following work rules. (A.R. 433). She assessed that his "symptoms would likely make it difficult for [him] to attend work on time, reliably, and on a full time basis" and "interact with the public and coworkers." (A.R. 434-435). To support her assessment, Chase relied on her diagnoses of PTSD and anxiety, as well as his flashbacks, intrusive thoughts, difficulty sleeping, fatigue, and impaired concentration and memory. (*Id.*).

At an appointment with Dr. Gartrell on September 26, 2014, Ford reported continuing sleep problems, depression, and somewhat improved PTSD. (A.R. 497). His MSE remained the same, except his affect included a tearful affect and his insight improved to good. (A.R. 497-98). The same day, Dr. Gartrell completed a mental assessment form. (A.R. 436-38). He opined that Ford had extreme limitations in his ability to deal with work stressors; maintain attention and concentration; and understand, remember, and carry out complex job instructions. (A.R. 436-37). He also assessed marked limitations in Ford's ability to relate to co-workers; deal with the public; interact with supervisors; function independently; understand, remember, and carry out

9

both detailed and simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; and demonstrate reliability. (*Id.*). He supported his opinion with diagnoses of major depression; PTSD; poor concentration, energy, and motivation; severe anxiety; poor stress tolerance; anger and irritability; and social impairment. (*Id.*). He determined that because Ford met the criteria for major depression, PTSD, and agoraphobia, all of his "physical or mental work related activity would be grossly impaired by severe depression, irritability, negative thinking, and anxiety." (A.R. 438). At the time, Ford was taking the medications mirtazapine, Xanax, and Buspar. (*Id.*).[5]

At his appointment with Dr. Gartrell on October 7, 2014, Ford reported that his mood and anxiety were improving. (A.R. 499). Dr. Gartrell noted that he had a full range of affect; a euthymic, dysphoric, and anxious mood; and good concentration/memory, insight, and judgment. (A.R. 499-500). Dr. Gartrell prescribed trazodone. (A.R. 500).[6] On October 17, 2014, Ford reported that his mood and anxiety continued to improve, his sleep was normalizing, and he was coping with stress well. (A.R. 501). His MSE remained unchanged, except he also demonstrated a sad and anxious affect and his concentration/memory was reduced to fair. (A.R. 501-02). On October 28, 2014, Ford reported that his mood was stable, and he was doing well with anxiety and sleep and having no suicidal ideation. (A.R. 503). His MSE remained mostly

---

[5] Mirtazapine is used to treat depression. Mirtazapine, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/mirtazapine-oral-route/description/DRG-20067334 (last visited Sept. 17, 2017).

Xanax is used to treat symptoms of anxiety, including anxiety caused by depression. Alprazolam, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/alprazolam-oral-route/description/drg-20061040 (last visited Sept. 17, 2017).

Buspar is used to treat certain anxiety disorders. Buspirone, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last visited Sept. 17, 2017).

[6] Trazodone is used to treat depression. Trazodone, MAYO CLINIC, http://www.mayoclinic.org/drugs-supplements/trazodone-oral-route/description/drg-20061280 (last updated Sept. 17, 2017).

the same, except that he no longer presented a sad affect.  (*Id.*).

Dr. Gartrell submitted a medical report for Ford on January 23, 2015, reporting that he had "severe dysphoria and anxiety, irritability, poor concentration, and psychomotor retardation" and suffered symptoms—including flashbacks, increased startle, nightmares, and hyper vigilance with vague paranoia—related to trauma in Afghanistan.  (A.R. at 443).  He also noted that Ford had shown some improvement over time with medication and supportive therapy.  (*Id.*).  He noted that Ford's sleep and mood had improved the most, but his anxiety and PTSD symptoms were more persistent.  (*Id.*).

### 6.     February 2015-March 2015

On February 3, 2015, Ford moved back to Massachusetts after separating from his husband and returned to treatment at MGH under Dr. Kapson.  (A.R. at 476).  In a March 11, 2015 letter, Dr. Kapson noted that Ford "continues to experience regular interference in his life from PTSD symptoms."  (*Id.*).  She indicated that Ford was willing to engage in therapy, and had already met with her for therapy three times since his return.  (A.R. at 476).

### C.     Administrative Hearing Testimony

Ford testified before the ALJ at a hearing on August 19, 2015.  (A.R. 42).  He testified that his "most serious thing . . . is the sleep issues," which have made it very difficult for him to get "more than four hours of sleep" each night since 2011.  (A.R. 49).  He said his sleep problems diminished his ability to concentrate, caused him to get frustrated very easily, and exacerbated his anxiety.  (A.R. 49-50).  He testified that since 2011 his flashbacks have become less vivid and he is less responsive to triggers, but his ability to socialize with people has become worse.  (A.R. 50).  When the ALJ asked Ford to reconcile his marriage and relocation to Baltimore with his reported inability to function socially, he responded that "if it weren't for the

PTSD, [he] wouldn't have gotten married," that "[i]t was . . . a grasp at something," and that they are now divorcing and not speaking.  (A.R. 50-51).

Ford testified that his PTSD symptoms interfere with his daily living up to 10-15 times a week, but there are some days when it is "quiet."  (A.R. 51).  He told the ALJ that most days he lies down during the day, for anywhere from thirty minutes to four hours.  (A.R. 52).  He still experiences PTSD-related triggers from loud noises including helicopters, loud bangs, and sirens, and large or unfamiliar crowds.  (A.R. 56).

Ford further testified that he lives with his 76-year-old father, who suffers from multiple sclerosis.  (A.R. 52).  He noted that although he helps care for his father, his father requires less care than his mother did.  (*Id.*).  He stated that he shops for groceries, does the laundry, and cooks for his father.  (A.R. 53).  He testified that although he had not read a book "within the last four years," he was "trying to get [his] brain active" so that he could get back to the things he loves to do, including reading.  (*Id.*).  He noted that, apart from his "medical stuff" and "taking care of [himself] and [his] father," his "primary hobby" had been trying to lose weight and working out at the YMCA, a 15-minute walk from his home.  (A.R. 53-54).  He noted that he usually goes to the gym and grocery store when it is less crowded because of his social anxiety.  (A.R. 56).  He also listens to music and sometimes watches television, but only spends 15-30 minutes each day on the computer because his low concentration causes him to lose patience.  (A.R. 54, 56).

Ford expressed that volunteering is something he "would like to do" and that he was "trying to figure out ways to rebuild the social part of [his] life."  (A.R. 55).  He noted that he was currently "trying to rebuild basically all of [his] friendships" because over the past two years they had "all kind of withered" due to his self-isolation.  (A.R. 57).

## II.    Procedural History

Ford applied for SSDI and SSI benefits on July 19, 2013, alleging a disability-onset date of January 1, 2013.  (A.R. at 25).  He appeared for a hearing before the ALJ on August, 19, 2015. (A.R. at 44).  On August 31, 2015, the ALJ concluded that Ford was not disabled, and on August 2, 2016, the Appeals Council denied his request for review.  (A.R. at 1, 35).  On October 3, 2016, Ford filed the present action seeking review of the decision of the Acting Commissioner pursuant to 42 U.S.C. § 405(g).

## III.    Analysis

### A.    Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's finding on any fact shall be conclusive if it is supported by substantial evidence and must be upheld "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion," even if the record could justify a different conclusion.  *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 221 (1st Cir. 1981); *see also Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 144 (1st Cir. 1987).

It is for the Commissioner, not the reviewing court, to evaluate credibility, draw inferences from the evidence, and resolve conflicts in the evidence.  *Rodriguez*, 647 F.2d at 222. While the ALJ must take medical evidence into account, "the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts."  *Lizotte v. Sec'y of Health & Human Servs.*, 654 F.2d 127, 128 (1st Cir. 1981) (quoting *Rodriguez*, 647 F.2d at 222).  Therefore, reversal is warranted only if the ALJ committed a legal error or if the ALJ's factual findings fail the substantial-evidence standard.  *See Roman-Roman v. Comm'r of*

13

*Soc. Sec.*, 114 F. App'x. 410, 411 (1st Cir. 2004); *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*. *See Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

**B.     Standard for Entitlement to SSDI or SSI Benefits**

To qualify for SSDI or SSI benefits, a claimant must be "disabled" within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 1382(a)(1), 1382c(a)(3) (setting forth the definition of "disabled" in the context of SSI). A claimant is "disabled," in relevant part, if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). The impairment must be severe enough to prevent the claimant from performing not only past work, but any substantial gainful work existing and available in the national economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.960(c)(1).

To determine whether a claimant is disabled, the Commissioner applies a five-step analysis. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The steps proceed as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that he or she can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see also* 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of production and proof during steps one through four, and the Commissioner has the burden at step five to offer evidence that other work exists in significant numbers in the national economy that

14

the claimant can perform.  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  At step five,

the ALJ assesses the claimant's RFC in combination with the vocational factors of the claimant's

age, education, and work experience to determine whether he can "engage in any . . . kind of

substantial gainful work which exists in the national economy."  *See* 42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); 20 C.F.R. § 404.1560(c)(1).

### C.      The ALJ's Findings

In evaluating the evidence, the ALJ followed the five-step process set forth in 20 C.F.R.

§ 404.1520(a)(4) to determine whether Ford had been disabled from January 1, 2013, his alleged

disability onset date, through the date of the decision.

At the first step, he expressly found that Ford had not engaged in substantial gainful

activity since January 1, 2013.  (A.R. 27).

At the second step, the ALJ concluded that Ford had the following impairments:  obesity,

PTSD, depression, and anxiety.  (*Id.*)  Because those impairments more than minimally limit his

ability to perform work-related activities, the ALJ considered them "severe."  (*Id.*).

At the third step, the ALJ determined that Ford's impairments, considered separately and

in combination, did not meet or medically equal the severity of any of the listed impairments in

20 C.F.R. Part 404, Subpart P, Appendix 1.  (A.R. 28; *see* 20 C.F.R. § 404.1520(d)).  He found

that Ford experienced mild difficulties in activities of daily living, moderate difficulties in social

functioning, and moderate difficulties concerning concentration, persistence, or pace.  (A.R. 28-

29).

At the fourth step, the ALJ determined Ford's RFC precluded him from performing any

past relevant work.  (A.R. 33).  He found that he has the RFC to perform a medium level of work,

except that he:

is unable to sustain complex tasks; is able to perform repetitive one to five-step tasks; is able to work without supervision; is able to work in the vicinity of coworkers and tolerate casual contact with coworkers but is unable to perform tandem tasks; and is unable to perform work requiring him to provide information to or receive information from the general public; but can tolerate basic, momentary, casual contact with the public such as taking tickets, checking off names, or making change.

(A.R. 29). After reviewing the evidence, the ALJ found that Ford's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (A.R. 30). However, he found that his statements concerning the intensity, persistence, and limiting effects of his symptoms were "not entirely credible," because they were inconsistent with his substantial reported activities, treatment notes, and with the record as a whole. (A.R. 30-33). Accordingly, he gave great weight to the opinions of the reviewing Disability Determination Services medical and psychological consultants, Dr. Walcutt and Dr. Nunez, and little weight to the opinions of Dr. Kapson, Dr. Gartrell, and Heather Chase. (A.R. 32-33).

At step five, the ALJ considered Ford's age, education, work experience, and RFC in conjunction with the Medical Vocational Guidelines of 20 C.F.R. Part 404, Subpart P, Appendix 2, and concluded that jobs exist in significant numbers in the national economy that he can perform. (A.R. 33). The ALJ posed the following hypothetical to vocational expert Ruth Baruch:

[C]onsider that the claimant . . . can understand and provide written instructions . . . [,] can keep and maintain a list, a sign-in sheet, something of that nature as well . . . [, and] is capable of performing up through the medium level of work on a sustained basis . . . . He has non-exertional limitations . . . . The combination, or individually of the effects of his depression, his anxiety, will, at times, during the day affect his concentration, his memory, his attention to task, his ability to follow instructions, his ability to conform to changes in the work environment. As a result he is not capable of sustaining complex tasks. To compensate, he is clearly capable of performing one to five-step repetitive tasks. He is able to work without supervision. He is able to work with co-workers, however, only on a casual basis. . . . Because during the day he's going to have deficiencies in his concentration, his attention to task, his ability to follow instructions, he should not work in tandem with other co-workers . . . . [T]he same issues that affect his ability to work in tandem affect his ability to work with

the public.

(A.R. 59-60).  Baruch testified that there were jobs for such a hypothetical claimant in the national economy in significant numbers.  (A.R. 61).  Based on that response, the ALJ determined that Ford would be able to perform the requirements of representative unskilled occupations, such as a bench assembler or mail clerk, which require light work, or a kitchen helper, which requires medium work.  (A.R. 34).  Those jobs are available in Massachusetts and the national economy.  (*Id.*).  Accordingly, the ALJ concluded that Ford is not disabled.  (*Id.*).

### D.    Plaintiff's Objections

Ford raises three objections to the ALJ's findings.  He contends that the ALJ (1) failed to give proper weight to the medical opinion evidence of Dr. Gartrell and Chase; (2) made an improper credibility determination that is not supported by substantial evidence; and (3) failed to properly account for his moderate mental limitations when presenting a hypothetical question concerning his RFC to the vocational expert.

### 1.    Weighing of Medical Opinion Evidence

Ford contends that the ALJ erred in making its RFC determination by failing to give significant weight to the medical opinions of his treating physicians.  Specifically, he points to the reports of Dr. Gartrell and Chase, and asserts that the ALJ inappropriately discounted their opinions in favor of the findings of the state agency psychological consultants, Dr. Walcutt and Dr. Nunez.

In making an RFC determination, a treating source's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" may be given controlling weight.  20 C.F.R. § 404.1527(c)(2); *see also Conte v. McMahon*, 472 F. Supp. 2d 39, 48 (D. Mass. 2007).  ALJs are "granted discretion to

resolve any evidentiary conflicts or inconsistencies," and "'the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians.'" *Hughes v. Colvin*, 2014 WL 1334170, at *8 (D. Mass. Mar. 28, 2014) (quoting *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)); *see also Pagan v. Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987) (explaining that medical opinions of treating physicians are not inherently entitled to greater weight than consulting physicians' opinions). The regulations permit ALJs to give lesser weight to an opinion from a treating source where it is "internally inconsistent or inconsistent with other evidence in the record including treatment notes and evaluations by examining and nonexamining physicians." *Arruda v. Barnhart*, 314 F. Supp. 2d 52, 72 (D. Mass. 2004); *see* 20 C.F.R. § 404.1527(c)(2)-(4). Opinions that are not given controlling weight are evaluated based on the length, nature, and extent of the treatment relationship; support from medical evidence; consistency of the opinion with the record; and specialization of the doctor. 20 C.F.R. § 404.1527(c). The ALJ must also "give good reasons . . . for the weight [he] give[s the] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2).

The ALJ's decision to give "less weight" to the opinions of Dr. Gartrell and Chase was justified. (A.R. 32-33). The ALJ reviewed the reports of both Dr. Gartrell and Chase and determined that their assessments were not only inconsistent with the record and consulting physicians' opinions but were also undermined by their own mostly benign MSEs and treatment notes. (*Id.*). Specifically, the ALJ found a disconnect between the severity of Ford's symptoms, as described in the record and treatment notes, and the limitations described by Dr. Gartrell and Chase. He stated that Dr. Gartrell and Chase's assessments of "numerous marked and extreme limitations . . . are contradicted by the claimant's substantial reported activities, which have included serving as the primary caregiver to his ill parents, maintaining a garden, working out at

the YMCA, shopping for groceries, preparing meals, doing laundry, using public transportation, driving, paying bills, and managing financial accounts." (A.R. 33). The ALJ also pointed to Chase's treatment notes that documented findings of "sadness and/or dysphoria[,] but no other serious mental status abnormalities." (A.R. 31). That is substantial evidence to support the ALJ's assessment of the weight to give to Dr. Gartrell's and Chase's opinions.

Moreover, the mere presence of conflicting evidence in the record is insufficient to overturn the ALJ's findings when they are otherwise supported by substantial evidence. *See Pagan*, 819 F.2d at 3 (finding that "the resolution of such conflicts in the evidence is for the Secretary"). Thus, even if the evidence Ford points to was required to be given more weight, it would not allow this Court to rule in his favor unless the evidence the ALJ ultimately relied on was insufficient or incorrect. *See Greene v. Astrue*, 2012 WL 1248977, at *3 (D. Mass. Apr. 12, 2012) (explaining that because the court's standard of review is for substantial evidence, plaintiff cannot simply point to evidence in the record supporting his position; he must demonstrate that the evidence relied on by the ALJ is insufficient or incorrect).

Here, the ALJ's reliance on the opinions of consulting physicians Dr. Walcutt and Dr. Nunez is likewise supported by substantial evidence. The consulting physicians determined, based on medical records by Ford's examining and treating physicians, that he had the capacity to perform simple tasks with limited interpersonal contact. (A.R. 92-93; A.R. 137-38). The reports of Dr. Walcutt and Dr. Nunez considered in detail objective and subjective reports of Ford's continuing anxiety and insomnia and their negative effects on his mood and cognition. (A.R. 100-01; A.R. 117-18). Dr. Walcutt and Dr. Nunez found that, despite his moderate mental and cognitive restrictions, Ford "is responding well to treatment," "functions in a generally independent fashion," "can meet various person needs from a mental standpoint," and "retains

the capacity to perform simple tasks from a mental health perspective." (A.R. 122-23). Based on Ford's treatment notes and substantial documented daily activities, it was reasonable for the ALJ to find Dr. Walcutt's and Dr. Nunez's opinions consistent with other substantial evidence in the record and thus give them significant weight. (A.R. 32).

Ford contends that the ALJ erred by giving the opinions of non-examining physicians significant weight because they did not address medical evidence generated after June 24, 2014. (Pl.'s Mem. 14). The opinion of a non-examining consultant cannot serve as substantial evidence if it is "based on a significantly incomplete record" and fails to account for a deterioration in the claimant's condition. *Alcantara v. Astrue*, 257 F. App'x 333, 334 (1st Cir. 2007). However, the ALJ may rely on older evidence from a non-examining consultant when the information remains accurate and there have been no appreciable changes in the claimant's symptoms or functional limitations in the evidence post-dating the assessment. *McNelley v Colvin*, 2016 WL 2941714, at *2 (1st Cir. 2016). Here, the only pieces of evidence that Ford alleges were not considered are Dr. Gartrell's and Chase's opinions, to which the ALJ justifiably ascribed little weight. In addition, both Dr. Gartrell's and Chase's treatment notes indicate that Ford's condition improved after June 24, 2014, if anything. It was not until August 8, 2014, that Dr. Gartrell began treating Ford with medication, and at both his October 7 and October 17, 2014 appointments with Dr. Gartrell, Ford reported that his mood and anxiety were improving, his sleep was normalizing, and he was coping with stress well. His MSEs also remained mostly unchanged after June 24, 2014, according to Dr. Gartrell and Chase's notes. Therefore, the ALJ's reliance on the non-examining physicians' opinions was supported by substantial evidence.

## 2. __Plaintiff's Credibility__

Ford next contends that the ALJ's basis for finding him "not entirely credible" is not supported by substantial evidence. Specifically, he contends that the ALJ, in determining his credibility, improperly found that he stopped working to care for his parents, made inconsistent statements about reading, was assessed GAF scores that were inconsistent with disability, and had gaps in treatment.

Because the credibility determination is for the ALJ to make, this Court must accept his conclusions as long as they are supported by substantial evidence. *See Ramirez v. Sec'y of Health, Educ. & Welfare*, 550 F.2d 1286, 1286 (1st Cir. 1977); *Musto v. Halter*, 135 F. Supp. 2d 220, 226-27 (D. Mass. 2001). When evaluating a plaintiff's credibility, the ALJ "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." *Da Rosa v. Sec'y of Health & Human Servs.*, 803 F.2d 24, 26 (1st Cir. 1986). Alleged functional limitations due to symptoms must be reasonably consistent with medical evidence and other evidence in the record. 20 C.F.R. § 404.1529. Factors considered in assessing the severity of symptoms include daily activities; location, duration, frequency, and intensity of symptoms; type, dosage, effectiveness, and side effects of medication; and treatment or any other measures used to relieve symptoms. *Id.*; *see also Avery v. Sec'y of Health & Human Servs.*, 797 F.2d 19, 29 (1st Cir. 1986). However, an ALJ is not required to specifically discuss all of these factors in making a decision as long as it is clear from the record as a whole that they were considered. *Deforge v. Astrue*, 2010 WL 3522464, at *9 (D. Mass. Sept. 9, 2010).

Here, the ALJ reasonably determined that Ford was not entirely credible. Ford is incorrect to state that there is no evidence that he stopped working to care for his parents rather than due to his medical condition. To support his credibility determination, the ALJ referred to

Dr. Kapson's treatment notes, which indicated that Ford stopped working in order to care for his ailing parents. (A.R. 31; A.R. 343). In addition, Dr. Goetter opined that Ford's symptoms were exacerbated by numerous psychosocial stressors, including his parents' failing health and demanding job. (A.R. 352-53). Ford himself told Dr. Gorman that his "work/travel schedule" and "caretaking for parents" caused him stress. (A.R. 368).

Ford further faults the ALJ's alleged reliance on his GAF scores, gaps in treatment, and inconsistent statements concerning reading. However, Ford misstates the ALJ's justification. Although the ALJ did mention those issues, he did not rely solely on them in assessing Ford's credibility. Rather, to support his finding that Ford's symptoms and limitations are not as severe as alleged, the ALJ mentioned his GAF scores in combination with other medical evidence, including treatment notes, and his substantial reported activities. (A.R. 29-33); *see Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (citing Administrative Memorandum AM-13066) (stating the SSA's policy that although ALJs can still consider GAF scores as some evidence, they cannot solely rely on the GAF scores and there must be other supporting evidence); *see also Navedo v. Colvin*, 2016 WL 3029943, at *12 (D. Mass. May 25, 2016).

In short, the ALJ's decision to give Ford's claims limited weight is supported by substantial medical evidence and will not be overturned.

### 3.    RFC Hypothetical

Finally, Ford argues that the ALJ erred by failing to accurately describe all of his mental limitations when presenting a hypothetical RFC to the vocational expert at the hearing. Specifically, he contends that the hypothetical used by the ALJ did not include his limitations due to his moderate difficulties with concentration, persistence, or pace, and stated only that he was mentally limited to one- to five-step repetitive tasks. The hypothetical posed by the ALJ to

the vocational expert must include and accurately describe all of the claimant's relevant impairments. *See Arocho v. Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982); *Aho v. Comm'r of Soc. Sec. Admin.*, 2011 WL 3511518, at *7 (D. Mass. Aug. 10, 2011).

But the ALJ's hypothetical did include Ford's mental limitations. In the hypothetical, the ALJ referred to Ford's concentration, persistence, or pace restrictions as the reason for his inability to work in tandem with others and sustain complex tasks. He stated that Ford's impairments "affect his concentration, his memory, his attention to task, his ability to follow instructions, [and] his ability to conform to changes in the work environment." (A.R. 60). He later explained that "during the day, [claimant will] have deficiencies in his concentration, his attention to task, [and] his ability to follow instructions." (*Id.*). The hypothetical specifically accounted for Ford's moderate concentration, persistence, or pace difficulties beyond the realm of social functioning. Thus, the ALJ fully accounted for his limitations and committed no error.

## IV.  Conclusion

For the foregoing reasons, plaintiff's motion for judgment on the pleadings reversing the ALJ's decision is DENIED, and defendant's motion for an order to affirm the decision of the Commissioner is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 28, 2017